**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

GARY PATTERSON,                          )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )          1:17CV567
                                         )
NANCY A. BERRYHILL,                      )
Acting Commissioner of Social            )
Security,                                )
                                         )
                    Defendant.           )

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Gary Patterson, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 7 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 10, 12; see also Docket Entry 11 (Plaintiff's Brief); Docket Entry 13 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

## I.  PROCEDURAL HISTORY

Plaintiff initially applied for DIB in January 2008, alleging an onset date of February 16, 2007, which he later amended to July 6, 2006. (See Tr. 65.) After administrative denials, and a de novo hearing before an Administrative Law Judge ("ALJ") which

Plaintiff, his attorney and a vocational expert ("VE") attended (see id.), the ALJ determined that Plaintiff did not meet the criteria for DIB between July 6, 2006, and March 22, 2010, the date of the ALJ's decision (Tr. 63-76). The Appeals Council subsequently denied review. (Tr. 80-84.)

Plaintiff filed a second application for DIB in April 2013, alleging disability as of March 23, 2010, the day after the prior ALJ's unfavorable decision due to the operation of res judicata (Tr. 252-53), and an application for Supplemental Security Income ("SSI") (see Tr. 112 (reflecting that Plaintiff filed claim for SSI in April 2013)).[1] The Disability Determination Services ("DDS") denied both of Plaintiff's applications initially (Tr. 85-97, 98-110, 111, 112, 167-74, 175-82.) On reconsideration, the DDS again denied Plaintiff's DIB claim (Tr. 113-34, 163, 192-99), but granted his SSI claim as of September 24, 2013, the day Plaintiff suffered a stroke (Tr. 135-62, 164, 200). Plaintiff thereafter requested a hearing de novo before an ALJ on the DIB claim only (Tr. 201), which Plaintiff, his attorney, and a VE attended (Tr. 40-62). The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 17-34.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 14-16, 350-52), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

_____

[1] The record does not contain Plaintiff's application for SSI.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.  [Plaintiff] last met the insured status requirements of the [] Act on June 30, 2012.

2.  [Plaintiff] did not engage in substantial gainful activity during the period from his alleged onset date of March 23, 2010 through his date last insured of June 30, 2012.

3.  Through the date last insured, [Plaintiff] had the following severe impairments: degenerative disc disease with disc bulging, depression, and anxiety.

. . .

4.  Through the date last inured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.  . . . [T]hrough the date last insured of June 30, 2012, [Plaintiff] had the residual functional capacity to perform light exertional work . . . with the following exceptions.  He could occasionally climb ladders, ropes and scaffolds.  He could occasionally climb ramps or stairs, balance, stoop, crouch, kneel and crawl.  He should avoid concentrated exposure to unprotected heights and was limited to simple, routine tasks.

. . .

6.  Through the date last insured, [Plaintiff] was unable to perform his past relevant work.

. . .

10. Through the date last insured, considering [Plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed.

. . .

11.  [Plaintiff] was not under a disability, as defined
in the [] Act, at any time from March 23, 2010, the
alleged onset date, through June 30, 2012, the date last
insured.

(Tr. 23-33 (bold font and internal parenthetical citations
omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits."  Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope
of [the Court's] review of [such a] decision . . . is extremely
limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).
Plaintiff has not established entitlement to relief under the
extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead,
the Court "must uphold the factual findings of the ALJ if they are
supported by substantial evidence and were reached through
application of the correct legal standard."  Hines, 453 F.3d at 561
(internal brackets and quotation marks omitted).  "Substantial
evidence means 'such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion.'"  Hunter v. Sullivan,
993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402
U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla
of evidence but may be somewhat less than a preponderance."  Mastro

4

v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal
quotation marks omitted).  "If there is evidence to justify a
refusal to direct a verdict were the case before a jury, then there
is substantial evidence."  Hunter, 993 F.2d at 34 (internal
quotation marks omitted).

     "In reviewing for substantial evidence, the [C]ourt should not
undertake to re-weigh conflicting evidence, make credibility
determinations, or substitute its judgment for that of the [ALJ, as
adopted by the Commissioner]."  Mastro, 270 F.3d at 176 (internal
brackets and quotation marks omitted).  "Where conflicting evidence
allows reasonable minds to differ as to whether a claimant is
disabled, the responsibility for that decision falls on the
[Commissioner] (or the ALJ)."  Id. at 179 (internal quotation marks
omitted).  "The issue before [the Court], therefore, is not whether
[the claimant] is disabled, but whether the ALJ's finding that [the
claimant] is not disabled is supported by substantial evidence and
was reached based upon a correct application of the relevant law."
Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

     When confronting that issue, the Court must take note that
"[a] claimant for disability benefits bears the burden of proving
a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981),
and that, in this context, "disability" means the "'inability to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of

---

[2] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[5]

### B.  Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ committed plain error by finding that the medical evidence does not show that [Plaintiff] suffers from a spinal disorder characterized by nerve root compression" (Docket Entry 11 at 12 (italics and single-spacing omitted));

2) "[t]he ALJ erred by failing to account for [Plaintiff's] need for a sit-stand option" (<u>id.</u> at 14 (italics and single-spacing omitted));

3) "[t]he ALJ erred by failing to adequately assess Dr. Hoeper's opinion as a treating physician" (<u>id.</u> (italics and single-spacing omitted));

---

[5]  A claimant thus can establish disability via two paths through the SEP.  The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

4) "[t]he ALJ erred by rejecting the opinion of Ms. Glogau, a consulting examiner" (id. at 18 (italics and single-spacing omitted));

5) "[t]he ALJ failed to explain why [Plaintiff] can work despite a moderate limitation in concentration, persistence, [or] pace (CPP) . . . [and] the hypothetical question failed to account for this limitation" (id. at 24 (italics and single-spacing omitted)); and

6) "[t]he ALJ's hypothetical failed to account for [Plaintiff's] need for a cane" (Id. at 25 (italics and single-spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 13 at 3-19.)

## 1. Listing 1.04A[6]

Plaintiff first contends that "[t]he ALJ committed plain error by finding that the medical evidence d[id] not show that [Plaintiff] suffers from a spinal disorder characterized by nerve root compression." (Docket Entry 11 at 12 (italics and single-spacing omitted).) In particular, Plaintiff asserts that "[a]t least *19 times*, the record said [Plaintiff] ha[d] compression of the lumbar nerve(s)" (id. (citing Tr. 87, 100, 520, 550, 585, 621,

---

[6] As the Commissioner argues, "[a]lthough Plaintiff does not specify that he is challenging the ALJ's findings with respect to sub[paragraph] A of [L]isting 1.04, [Plaintiff's] focus on the word 'compression' suggests that this sub[paragraph] is the crux of his challenge." (Docket Entry 13 at 5 n.1; see also Docket Entry 11 at 12-14.)

674, 700, 712, 726, 755, 767, 845, 857, 873, 887, 891, 905, 1004)),
but that "*[n]ot once* did the ALJ cite th[at] evidence" (id.).
According to Plaintiff, the ALJ's failure to "use any form of the
word 'compress' or 'compression'" in the decision "greatly tends to
show the unthinkable – that the ALJ intentionally and repeatedly
closed her eyes to evidence highly favorable to [Plaintiff]." (Id.
at 13.)  Plaintiff maintains that the ALJ's error in this regard
qualifies as clearly erroneous, because that error "easily passes
the 'dead fish' test, applied in the [United States Court of
Appeals for the] Fourth Circuit and elsewhere."  (Id. (quoting
Parts & Elec. Motors, Inc. V. Sterling Elec., Inc., 866 F.2d 228,
233 (7th Cir. 1988) ("To be clearly erroneous, a decision must
strike us as more than just maybe or probably wrong; it must . . .
strike us as wrong with the force of a five-week old,
unrefrigerated dead fish."), and citing TFWS, Inc. v. Franchot, 572
F.3d 186, 194 (4th Cir. 2009)).)

        "Under Step 3, the [Social Security Administration's SEP]
regulation states that a claimant will be found disabled if he or
she has an impairment that 'meets or equals one of [the] listings
in [A]ppendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the
duration requirement.'" Radford v. Colvin, 734 F.3d 288, 293 (4th
Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii)) (internal
bracketed numbers omitted).  "The listings set out at 20 CFR [P]t.
404, [S]ubpt. P, App['x] 1, are descriptions of various physical

and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted).  "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." <u>Bennett</u>, 917 F.2d at 160 (citing <u>Zebley</u>, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)); <u>see also</u> <u>Zebley</u>, 493 U.S. at 530 ("An impairment that manifests only some of th[e] criteria [in a listing], no matter how severely, does not qualify.").

An ALJ must identify the relevant listed impairments and compare them to a claimant's symptoms only where "there is <u>ample evidence</u> in the record to support a determination that [the claimant's impairment] met or equalled [sic] one of the [ ] impairments listed in Appendix 1 . . . ." <u>Cook v. Heckler</u>, 783 F.2d 1168, 1172 (4th Cir. 1986) (emphasis added); <u>see also</u> <u>Russell v. Chater</u>, No. 94-2371, 60 F.3d 824 (table), 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (unpublished) ("<u>Cook</u> . . . does not establish an inflexible rule requiring an exhaustive point-by-point discussion [of listings] in all cases."); <u>Ollice v. Colvin</u>, No. 1:15CV927, 2016 WL 7046807, at *3 (M.D.N.C. Dec. 2, 2016) (unpublished) (Peake, M.J.) ("[A]n ALJ is not required to explicitly identify and discuss every possible listing; however, he

must provide sufficient explanation and analysis to allow meaningful judicial review of his step three determination where the 'medical record includes a <u>fair amount of evidence</u>' that a claimant's impairment meets a disability listing." (emphasis added) (quoting <u>Radford</u>, 734 F.3d at 295)), <u>recommendation adopted</u>, slip op. (M.D.N.C. Jan. 10, 2017) (Osteen, Jr., J.).

Listing 1.04A requires proof of a "[d]isorder[] of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord" <u>and</u>:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04A. "Listing 1.04A requires a claimant to show only what it requires him to show: that each of the symptoms are present, and that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months." <u>Radford</u>, 734 F.3d at 294.

Here, the ALJ analyzed all three subparagraphs (e.g., A, B, and C) of Listing 1.04 together in one paragraph:

> The [ALJ] consulted [L]isting 1.04 disorders of the spine. [Plaintiff's] condition in his back does not meet this [L]isting because <u>there is not sufficient evidence of nerve root compression</u>, motor loss, sensory/reflex

loss, spinal arachnoiditis, or lumbar spinal stenosis
resulting in pseudoclaudication and inability to ambulate
effectively as defined by [20 C.F.R. Pt. 404, Subpt. P,
App'x 1, § ]1.00(b)(2)(b). The holding in *Radford*[] was
fully considered in making this determination.

(Tr. 25 (emphasis added).)

The ALJ erred by finding that "there [wa]s not sufficient
evidence of nerve root compression" (Tr. 25), as an MRI of
Plaintiff's lumbar spine performed on March 24, 2010, showed a
"[s]mall left foraminal disc protrusion with associated annular
tear [which] create[d] only minimal foraminal stenosis" at L4-5,
and a "[l]eft central disc extrusion" at L5-S1 which "migrate[d]
caudally and create[d] significant mass effect on the descending
left S1 nerve root in the lateral recess" (Tr. 367). Many of
Plaintiff's physicians subsequently referred to that MRI as showing
evidence of nerve compression. (See, e.g., Tr. 550, 674, 700.)

However, the ALJ's error in that regard remains harmless under
the circumstances of this case. See generally Fisher v. Bowen, 869
F.3d 1055, 1057 (7th Cir. 1989) ("No principle of administrative
law or common sense requires us to remand a [Social Security] case
in quest of a perfect opinion [from an ALJ] unless there is reason
to believe that the remand might lead to a different result.").
Here, Plaintiff has not even argued (much less shown) that he
suffered from "motor loss (atrophy with associated muscle weakness
or muscle weakness) accompanied by sensory or reflex loss and, if
there is involvement of the lower back, positive straight-leg

raising test (sitting and supine)" during the relevant period in this case. (See Docket Entry 11 at 12-14.) As the record lacks ample evidence that Plaintiff's back impairment could have met or medically equaled Listing 1.04A during the relevant period, the ALJ did not commit prejudicial error by determining that the record did not contain "sufficient evidence of nerve root compression" (Tr. 25). See Williamson v. Colvin, No. 1:10CV547, 2014 WL 459850, at *6 (M.D.N.C. Feb. 5, 2014) (unpublished) (finding that, although ALJ erred by finding no evidence of nerve root compression and stenosis, substantial evidence still supported ALJ's determination that the plaintiff did not meet or equal Listing 1.04A, where he had not shown many of the other criteria of that Listing), recommendation adopted, slip op. (M.D.N.C. Mar. 28, 2014) (Tilley, S.J.).

## 2. Plaintiff's Need for a Sit/Stand Option

In Plaintiff's next issue on review, he alleges that the ALJ erred by failing to incorporate the sit/stand option from the prior ALJ's decision into the RFC and dispositive hypothetical question to the VE. (See Docket Entry 11 at 14.) According to Plaintiff, "[i]t cannot reasonably be maintained that [Plaintiff's] condition improved after the date of the prior unfavorable decision" and, thus, "the ALJ was required to incorporate into the RFC and hypothetical question the same sit/stand option as required in the

prior decision – or explain why it should not be incorporated . . .
[but] did neither." (Id.)  That argument misses the mark.

The Fourth Circuit previously has addressed the manner in
which an ALJ treated a prior denial of the claimant's application
for benefits. See Albright, 174 F.3d at 474-78.  In that case, the
new ALJ did not analyze whether the claimant's condition had
worsened since the prior ALJ's decision, but rather simply adopted
the prior ALJ's denial of benefits as res judicata based upon the
Social Security Administration's ("SSA") Acquiescence Ruling 94-
2(4) ("AR 94-2(4)"). Id. at 474, 475.  AR 94-2(4) required ALJs to
adopt findings from prior ALJ decisions unless the claimant
produced new and material evidence.  Id.  The Fourth Circuit found
the application of AR 94-2(4) to Albright's claim for benefits
"imprudent," id. at 477, and contrary to the SSA's long-standing
"treatment of later-filed applications as separate claims," id. at
476.

In response to Albright, the SSA issued Acquiescence Ruling
00-1(4), (Interpreting Lively v. Secretary of Health and Human
Services) – Effect of Prior Disability Findings on Adjudication of
a Subsequent Disability Claim – Titles II and XVI of the Social
Security Act, 2000 WL 43774 (Jan. 12, 2000) ("AR 00-1(4)").  AR 00-
1(4) provides as follows:

> When adjudicating a subsequent disability claim . . ., an
> [ALJ] determining whether a claimant is disabled during
> a previously unadjudicated period must consider . . . . a
> prior finding [of a claimant's RFC or other finding

required at a step in the SEP] as evidence and give it
appropriate weight in light of all relevant facts and
circumstances. In determining the weight to be given
such a prior finding, an [ALJ] will consider such factors
as: (1) whether the fact on which the prior finding was
based is subject to change with the passage of time, such
as a fact relating to the severity of a claimant's
medical condition; (2) the likelihood of such a change,
considering the length of time that has elapsed between
the period previously adjudicated and the period being
adjudicated in the subsequent claim; and (3) the extent
that evidence not considered in the final decision on the
prior claim provides a basis for making a different
finding with respect to the period being adjudicated in
the subsequent claim.

AR 00-1(4), 2000 WL 43774, at *4 (emphasis added).

Here, the ALJ noted at the outset of her decision that, "[i]n
determining the weight to be given [to the prior ALJ's] finding[s],
she ha[d] considered" factors required by AR 00-1(4). (Tr. 22.)
The ALJ then further explained the weight she accorded to the prior
ALJ's RFC as follows:

Pursuant to *Albright*, the [ALJ] gave great weight to the
[RFC] assessment contained in the prior ALJ decision, as
it was generally consistent with the diagnostic imaging
results and the observations of [Plaintiff's] treatment
providers that [Plaintiff] did not always have an
antalgic gait. It is also consistent with [Plaintiff's]
non-compliance with treatment recommendations. However,
less weight was given to the sit/stand option, as the
current record does not contain sufficient objective
evidence of problems standing or sitting, and this
limitation is inconsistent with [Plaintiff's] refusal to
participate in treatments that could have alleviated his
pain.

(Tr. 29 (internal citation omitted) (emphasis added).)

The ALJ's evaluation of the prior ALJ's decision complies with

AR 00-1(4). Contrary to Plaintiff's allegations (see Docket Entry

16

11 at 14), the ALJ did expressly explain why she did not incorporate the prior ALJ's sit/stand option into the RFC and hypothetical question (see Tr. 29). As emphasized above, the ALJ noted that "the <u>current</u> record d[id] not contain sufficient objective evidence of problems standing or sitting" (<u>id.</u> (emphasis added)), thus considering "the extent that evidence not considered in the final decision on the prior claim provide[d] a basis for making a different finding," AR 00-1(4), 2000 WL 43774, at *4.

Moreover, the ALJ's discussion of Plaintiff's treatment for back pain dated after the prior ALJ's decision on March 22, 2010 (see Tr. 27-28), supports her finding that the sit/stand option did not harmonize with Plaintiff's "refusal to participate in treatments that could have alleviated his pain" (Tr. 29). For example, the ALJ noted that:

- In July 2010, Dr. Shahid Nimjee recommended that Plaintiff undergo surgery to help alleviate his back symptoms, but Plaintiff declined and the neurological clinic discharged Plaintiff from its care (see Tr. 27);

- In October 2010, Dr. Bibhu Mohanty found Plaintiff an excellent candidate for surgery but Plaintiff still refused (see <u>id.</u>);

- In December 2010, Plaintiff informed a physical therapist that "he knew what exercises needed to be done and that he would do them at home, and he was discharged without any further recommendation for additional therapy sessions" (Tr. 27-28);

- In January 2011, "although Dr. Mohanty again indicated that surgery might be the best option, [Plaintiff] adamantly refused" (Tr. 28);

- In February 2011, Plaintiff "declined both surgery and injections" (id.);

- In September 2011, Dr. Joel Goldberg noted that Plaintiff "might benefit from chiropractic care or other alternative therapies" but no indication exists that Plaintiff pursued those options (id.);

- In November 2011, Plaintiff "was again not taking his medication as prescribed" and complained that his medications made him foggy yet asked his doctor to increase his Oxycodone (id.);

- In January 2012, Dr. Megan Brooks "reported that [Plaintiff] continued to refuse both surgery and physical therapy" and that Plaintiff might not have been taking his medications as prescribed (id.); and

- In June 2012, concerns remained about Plaintiff's compliance with treatment recommendations (id.).

As the ALJ's analysis sufficiently complies with AR 00-1(4), Plaintiff has not shown that the ALJ erred by omitting the prior ALJ's sit/stand option from the RFC and hypothetical question.

### 3. Medical Opinions of Dr. Edwin W. Hoeper

Next, Plaintiff contends that the ALJ erred by assigning no weight to the opinions of Plaintiff's treating psychiatrist, Dr. Hoeper. (Docket Entry 11 at 14-18.) Plaintiff has not established a basis for relief.

In this case, on March 6, 2016, Dr. Hoeper completed a Medical Source Statement ("MSS") (Tr. 1371-75), diagnosing Plaintiff with major depression (see Tr. 1371), characterized by a flat affect, depressed mood, and social isolation (see Tr. 1372). Dr. Hoeper opined that, as a result of that impairment, Plaintiff experienced

marked to extreme loss of ability in nearly all mental functional
areas, including handling detailed instructions, maintaining his
attention and concentration, making simple work-related decisions,
performing at a consistent pace (see Tr. 1373), interacting with
the public, handling instructions and criticism, getting along with
co-workers, and responding appropriately to changes (see Tr. 1374).
In addition, Dr. Hoeper opined that Plaintiff's "impairments or
treatment would cause [him] to be absent from work[] . . . [m]ore
than 3 times a month." (Tr. 1372.) Dr. Hoeper indicated that
Plaintiff's "condition existed and persisted with the restrictions
as outlined in th[e] [MSS] at least since [March 23, 2010]." (Tr.
1375.)

> The ALJ assessed Dr. Hoeper's opinions as follows:
>
> The [ALJ] . . . places no weight in the opinions of [Dr.
> Hoeper]. . . . He did not even start treating
> [Plaintiff] until two years after the date last insured.
> Additionally, as of the opinion he had only treated her
> [sic] for 21 weeks, which does not establish a
> significant longitudinal relationship. Further, the
> opinion . . . does not contain objective evidence for the
> limitations, and the objective treatment record does not
> support such severe limitations.

(Tr. 31 (internal citations omitted).) Plaintiff challenges the
ALJ's rejection of Dr. Hoeper's opinions on four grounds: 1) the
ALJ erred by dismissing Dr. Hoeper's opinions outright "because
they post-dated the [date last insured ('DLI')] by two years"
(Docket Entry 11 at 15-16); 2) "the ALJ cited *no evidence* that the
period of treatment was insufficient to allow Dr. Hoeper the

19

deference accorded a treating physician" (id. at 16); 3) contrary to the ALJ's finding, "the MSS *does* cite objective evidence" (id.); and 4) "the ALJ's finding that the 'objective treatment record does not support such severe limitations' is not only false but plainly conclusory" (id. at 17).  None of those contentions carry the day.

a. Post-DLI Evidence

Plaintiff points to the ALJ's failure to "discuss any of Dr. Hoeper's treatment notes in her summary of the evidence" and her failure to "discuss Dr. Hoeper's opinions in any meaningful sense" (id. at 15) as "consistent with her view that Dr. Hoeper's opinions should not even be considered because they post-dated the DLI by two years" (id. at 16).  According to Plaintiff, the ALJ erred by "automatically barr[ing]" Dr. Hoeper's MSS from consideration on the basis of its timing.  (Id. (citing, inter alia, Woolridge v. Secretary of Health & Human Servs., 816 F.2d 157, 160 (4th Cir. 1987)).)

The Fourth Circuit addressed the issue of an ALJ's obligation to consider medical evidence that post-dates a claimant's DLI in Bird v. Commissioner of Soc. Sec. Admin., 699 F.3d 337 (4th Cir. 2012).  In that case, the Fourth Circuit held "that post-DLI medical evidence generally is admissible in [a Social Security] disability determination in such instances in which that evidence permits an inference of linkage with the claimant's pre-DLI condition." Bird, 699 F.3d at 341 (emphasis added) (citing Moore

v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969)).  In <u>Moore</u>, the Fourth Circuit found such linkage in medical evaluations post-dating the claimant's DLI that "reflect[ed] . . . a possible earlier and progressive degeneration."  <u>Moore</u>, 418 F.2d at 1226.

As an initial matter, Plaintiff's own argument dispels his assertion that the ALJ dismissed Dr. Hoeper's MSS outright because of its timing, as Plaintiff readily admits that the ALJ gave <u>four</u> separate reasons for rejecting Dr. Hoeper's opinions.  (<u>See</u> Docket Entry 11 at 14-18.)  Moreover, the facts of this case materially distinguish it from <u>Bird</u> because, unlike in <u>Bird</u>, Dr. Hoeper's opinions on the MSS do not "<u>permit[] an inference of linkage with the claimant's pre-DLI condition</u>."  <u>Bird</u>, 699 F.3d at 341 (emphasis added).  Although Dr. Hoeper opined that Plaintiff's restrictions had persisted since Plaintiff's alleged onset date of March 23, 2010 (<u>see</u> Tr. 1375), Dr. Hoeper did not even begin treating Plaintiff until over four years later on June 12, 2014 (<u>see</u> Tr. 1365-69).  Furthermore, as the Commissioner argues (<u>see</u> Docket Entry 13 at 11), in the interim between Plaintiff's onset date and the commencement of treatment with Dr. Hoeper, Plaintiff suffered a debilitating stroke that resulted in Plaintiff qualifying for SSI as of the date of his stroke, September 24, 2013 (<u>see</u> Tr. 135-62, 164, 200).  Because Dr. Hoeper "never observed or examined Plaintiff before that stroke, . . . [he] ha[d] no insight into Plaintiff's pre-stroke mental functionality."  (Docket Entry 13 at

11.)  Thus, the ALJ did not err by rejecting Dr. Hoeper's opinions, in part, because of their post-DLI timing.

b. Length of Treatment Relationship

Plaintiff next contends that that "[t]he ALJ also erred by rejecting Dr. Hoeper's MSS on the ground that 21 weeks of treatment did not establish a 'significant longitudinal relationship.'" (Docket Entry 11 at 16 (quoting Tr. 31).)  The ALJ erred by finding that, "as of the [date of the MSS, Dr. Hoeper] had only treated her [sic] for 21 weeks, which does not establish a significant longitudinal relationship." (Tr. 31 (emphasis added).)  The record contains four treatment notes from Dr. Hoeper spanning from June 12, 2014, to September 30, 2015 (see Tr. 1350-69), a period of over 15 months.[7]  However, because the ALJ's other grounds for rejecting Dr. Hoeper's opinions remain sound, any such error by the ALJ remains harmless here.  See generally Fisher, 869 F.3d at 1057 ("No principle of administrative law or common sense requires us to remand a [Social Security] case in quest of a perfect opinion [from an ALJ] unless there is reason to believe that the remand might lead to a different result.").

---

[7] In response to the request on the MSS to provide the "[f]requency and length of contact[,]" Dr. Hoeper handwrote "[illegible] [every] 21 WEEKS" (Tr. 1371), which likely meant to convey the frequency of Plaintiff's visits with Dr. Hoeper, but might account for the ALJ's mistaken finding that Plaintiff treated with Dr. Hoeper for a total of only 21 weeks (see Tr. 31).  However, the ALJ also acknowledged that Dr. Hoeper first treated Plaintiff in 2014 (see id. (reflecting ALJ's statement that Dr. Hoeper "did not even start treating [Plaintiff] until two years after the date last insured")) and, thus, the ALJ's finding that Dr. Hoeper only treated Plaintiff for 21 weeks qualifies as internally inconsistent and irreconcilable with the record.

c. Objective Findings to Support Opinions

Plaintiff also faults the ALJ for finding that Dr. Hoeper's opinions lacked "'objective evidence for the limitations.'" (Docket Entry 11 at 16 (quoting Tr. 31).) According to Plaintiff, Dr. Hoeper did cite to objective evidence on the MSS (see id.), in the form of "[p]sychiatric signs[,]" defined as "abnormalities of behavior, mood, thought, memory, orientation, development, or perception . . . shown by observable facts that can be medically described and evaluated" (id. at 17 (quoting 20 C.F.R. § 404.1528(b))).

Although Plaintiff does not identify the "[p]sychiatric signs" Dr. Hoeper cited on the MSS (see id. at 16-17), Dr. Hoeper did check various boxes on the pre-printed MSS indicating Plaintiff's "signs and symptoms" (see Tr. 1371). However, as the Commissioner argues (see Docket Entry 13 at 12), Dr. Hoeper did not attempt to explain how any objective symptoms he may have observed in Plaintiff in 2014 and 2015, after Plaintiff's stroke, supported "extreme" limitations in multiple functional areas (defined as "[c]omplete loss of ability in the named activity" (Tr. 1372)) dating back to March 23, 2010 (see Tr. 1371-75). Moreover, the MSS fails to clarify whether Dr. Hoeper objectively observed the checked symptoms or merely recited Plaintiff's subjective reports. (See Tr. 1371.) As such, the ALJ did not err by finding that the

23

MSS lacked objective evidence to support the extreme limitations. (See Tr. 31.)

d. Consistency of Opinions with the Record

Plaintiff further challenges "the ALJ's finding that 'the objective treatment record does not support such severe limitations' [a]s not only false but plainly conclusory." (Docket Entry 11 at 17 (citing Tr. 31).) Plaintiff maintains, without supporting citation, that "an ALJ can reject a treating physician's opinion only by citing 'persuasive contradictory evidence[,]'" and that the ALJ did "not even mention any conflicting or inconsistent evidence" in rejecting Dr. Hoeper's opinions. (Id.)

As an initial matter, Plaintiff misrelies on the "persuasive contradictory evidence" standard. (Id.) That phrasing of the "treating physician rule" no longer represents the governing standard. See Stroup v. Apfel, No. 96-1722, 205 F.3d 1334 (table), 2000 WL 216620, at *5 (4th Cir. Feb. 24, 2000) (unpublished) ("The 1991 regulations supersede the 'treating physician rule' from our prior case law."); Shrewsbury v. Chater, No. 94-2235, 68 F.3d 461 (table), 1995 WL 592236, at *2 n.5 (4th Cir. Oct. 6, 1995) (unpublished) ("As regulations supersede contrary precedent, the cases cited by [the plaintiff] defining the scope of the 'treating physician rule' decided prior to 20 C.F.R. § 416 and related regulations are not controlling." (internal citation omitted)); accord Brown v. Astrue, Civil Action No. CBD-10-1238, 2013 WL

937549, at *4 (D. Md. Mar. 8, 2013) (unpublished); <u>Benton v.</u>
<u>Astrue</u>, Civil Action No. 0:09-892-HFF-PJG, 2010 WL 3419272, at *1
(D.S.C. Aug. 30, 2010) (unpublished); <u>Pittman v. Massanari</u>, 141 F.
Supp. 2d 601, 608 (W.D.N.C. 2001); <u>Ward v. Chater</u>, 924 F. Supp. 53,
55-56 (W.D. Va. 1996).

Under the proper standard, the treating source rule does
generally require an ALJ to give controlling weight to the opinion
of a treating source regarding the nature and severity of a
claimant's impairment. <u>See</u> 20 C.F.R. § 404.1527(c)(2) ("[T]reating
sources . . . provide a detailed, longitudinal picture of [a
claimant's] medical impairment(s) and may bring a unique
perspective to the medical evidence that cannot be obtained from
the objective medical findings alone or from reports of individual
examinations, such as consultative examinations or brief
hospitalizations."). The rule also recognizes, however, that not
all treating sources or treating source opinions merit the same
deference. The nature and extent of each treatment relationship
appreciably tempers the weight an ALJ affords an opinion. <u>See</u> 20
C.F.R. § 404.1527(c)(2)(ii). Moreover, as subsections (2) through
(4) of the rule describe in great detail, a treating source's
opinion, like all medical opinions, deserves deference <u>only</u> if
well-supported by medical signs and laboratory findings <u>and</u>
consistent with the other substantial evidence in the case record.
<u>See</u> 20 C.F.R. § 404.1527(c)(2)-(4). "[I]f a physician's opinion is

not supported by clinical evidence <u>or</u> if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Craig</u>, 76 F.3d at 590 (emphasis added).

Here, although the ALJ did not specify the objective evidence that failed to support Dr. Hoeper's opinions in the same paragraph in which she weighed those opinions (<u>see</u> Tr. 31), elsewhere in the ALJ's decision, she detailed findings in Plaintiff's mental health treatment that did not support Dr. Hoeper's extreme limitations (<u>see</u> Tr. 28-29).  For example, the ALJ noted:

- Plaintiff reported symptoms of depression in June 2011, but declined any medication (Tr. 28);

- Following Plaintiff's hospitalization in September 2011 for depression and suicidal thoughts, he "continued attending group therapy, and although he was at times tearful with a depressed mood, he had no further suicidal ideation, no hallucinations, and no delusions . . . [and] was generally an active participant in therapy" (<u>id.</u>);

- "By October 2011, [Plaintiff] reported being less tearful and more able to be around other people" (<u>id.</u>);

- Towards the end of 2011, Plaintiff "started arriving late [to therapy], did not bring his manual, . . . did not do the assigned homework[, and] . . . was not using calming techniques taught during this therapy" (<u>id.</u>);

- In January 2012, Plaintiff "reported he had a good relationship with his family," as well as "that his medications and group therapy helped him with his symptoms," and, after finding Plaintiff "engaged and cooperative" (<u>id.</u>), Dr. Jeffrey White "recommended that [Plaintiff] continue with group therapy, go through vocational rehabilitation . . . , and increase his social networks" (Tr. 29); and

- "By May 2012, [Plaintiff] had declined participation in individual therapy twice and he was not taking his medications consistently as prescribed" (id.).

The ALJ's above-described analysis supplies substantial evidence to support her finding that "the objective treatment record d[id] not support [Dr. Hoeper's] severe limitations." (Tr. 31.)

### 4. Medical Opinions of Louise Glogau, M.A., L.P.A.

In Plaintiff's fourth issue on review, he asserts that "[t]he ALJ erred by rejecting the opinion of Ms. Glogau, a consulting examiner." (Docket Entry 11 at 18 (italics and single-spacing omitted).) Plaintiff's allegations miss the mark.

On January 13, 2012, Ms. Glogau issued a report containing opinions regarding Plaintiff's ability to function mentally based on an examination of Plaintiff on November 14, 2011. (Tr. 353-56.) Ms. Glogau diagnosed Plaintiff with "[m]ood [d]isorder [s]econdary to chronic pain in left foot and lower back" and "[d]epressive [d]isorder [not otherwise specified]" (Tr. 353), characterized by a "depressed mood during most of the day, nearly every day," "feeling sad and discouraged," and "crying spells and mood swings" (Tr. 354), as well as irritability and "feeling helpless and hopeless" (Tr. 355). Ms. Glogau further opined as follows:

> These symptoms cause clinically significant impairment in [Plaintiff's] social, occupational, and personal functioning. . . . His mood swings prevent him from being consistently productive at any job. His problems with memory and concentration negatively impact his ability to learn new skills. Due to cognitive problems, he is not able to perform any job that requires extended

27

periods of concentration, problem solving, or decision making. Because of his hyperirritability he is severely compromised in his ability to initiate or sustain work or social relationships. Because of his isolating behaviors and lack of trust he is also severely compromised in his ability to initiate or sustain social relationships. Due to the longstanding nature of his illness and increased health concerns, his prognosis for recovery is poor. Therefore, I consider him to be permanently and totally disabled and unemployable.

(Tr. 355-56.)

The ALJ assessed Ms. Glogau's opinions as follows:

The opinion of evaluator Ms. Glogau is given little weight. Her opinion is evaluated as a non-acceptable medical source pursuant to Social Security Ruling 06-03p. . . . Her opinion was vague, as it did not indicate how [Plaintiff] was specifically limited in vocational terms. It was also based on a single interaction and was heavily, if not entirely, dependent on [Plaintiff's] subjective representations.

(Tr. 30 (internal citation omitted).)

Plaintiff challenges the ALJ's rejection of Ms. Glogau's opinions on four grounds: 1) the ALJ erred by rejecting Ms. Glogau's opinion "primarily because she . . . is not an 'acceptable medical source'" (Docket Entry 11 at 20 (quoting Tr. 30)); 2) the ALJ erred by finding Ms. Glogau's opinions vague, as Ms. "Glogau *did* 'indicate how [Plaintiff] was specifically limited in vocational terms'" (id. at 21 (quoting Tr. 30)); 3) the ALJ's decision to discount Ms. Glogau's opinions because she only evaluated Plaintiff once qualifies as "self-contradictory" because the ALJ "gave great weight to the opinions of the State *non*-examiners . . . while giving little weight to a DDS-appointed

*examiner*" (id. at 22 (internal quotation marks omitted)); and 4) "the record does not support the ALJ's conclusion that [Ms.] Glogau's opinion was based heavily on [Plaintiff's] subjective report" (id. (internal quotation marks omitted)).  None of those arguments has merit.

a. Non-Acceptable Medical Source

Plaintiff asserts that "it is strange – and extremely unfair – that North Carolina DDS, *with the Commissioner's approval*, would appoint [a Licensed Psychological Associate ("LPA")] as a consulting examiner, only to have the Commissioner disavow the LPA's opinion as being that of an 'other source' when it favors [Plaintiff]."  (Id. at 20.)  Plaintiff maintains that "[t]he Commissioner should be equitable [sic] estopped from attacking LPAs as being non-acceptable medical sources."  (Id.)

Plaintiff's argument proceeds from a faulty premise – that the DDS and/or the Commissioner ordered the evaluation by Ms. Glogau. In fact, the record strongly suggests otherwise.  First, the timing of Ms. Glogau's evaluation would belie Plaintiff's claim that the DDS ordered it.  The prior ALJ denied Plaintiff's first claim for DIB on March 22, 2010 (Tr. 63-76), and Plaintiff did not file his second claim for DIB until April 9, 2013 (Tr. 252-53).  Thus, Plaintiff had no pending claim for DIB at the time of Ms. Glogau's examination (November 14, 2011) or her report (January 13, 2012). (See Tr. 353.)  Second, the index to the administrative transcript

lists Ms. Glogau's report as "[o]ffice [t]reatment [r]ecords, dated 01/13/2012, from GLOGAU LOUISE MA, LPA" (Docket Entry 7 at 4 (emphasis added)), but lists the reports of consultative examiners Dr. Anthony J. Smith and Dr. J. Staneata as "CE Psychology" and "CE Internal Medicine[,]" respectively (id. (emphasis added)). Thus, no unfairness arises from the ALJ's determination that Ms. Glogau constitutes a non-acceptable medical source under the regulations. (See Tr. 30.)

Plaintiff maintains that "[c]ourts are still unresolved on" the secondary issue of whether an LPA constitutes a non-acceptable medical source under 20 C.F.R. § 404.1513(a)(2). (Docket Entry 11 at 21 n.9.) In that regard, Plaintiff asserts that "the only case to broach the subject – Wright v. Astrue, decided by this Court – declared that '[t]he sole case to directly address the issue sides with [the p]laintiff.'" (Id. (quoting Wright v. Astrue, No. 1:09CV0003, 2012 WL 182167, at *7 (M.D.N.C. Jan. 23, 2012) (unpublished) (in turn citing Helvey v. Astrue, No. 07-26-GWU, 2008 WL 162138, at *5 (E.D. Ky. Jan. 16, 2008) (unpublished)), recommendation adopted, slip op. (M.D.N.C. Mar. 12, 2012) (Eagles, J.)).)

Although some uncertainty in the matter may remain, see Hobson v. Berryhill, No. 5:16-CV-489-D, 2017 WL 2571284, at *10 (E.D.N.C. May 22, 2017) (unpublished) (noting that issue "appear[ed] to be unsettled under the law"), recommendation adopted, No.

5:16-CV-489-D, 2017 WL 2570664 (E.D.N.C. June 13, 2017) (unpublished), several cases decided after Wright and Helvey have concluded that LPAs do not constitute acceptable medical sources under the regulations. See Carpenter, Jr. v. Colvin, No. 5:14-CV-858-FL, 2016 WL 1258467, at *1 (E.D.N.C. Mar. 30, 2016) (unpublished) (deeming LPA non-acceptable medical source); Way v. Colvin, No. 5:14-CV-411-D, 2015 WL 4545721, at *9 (E.D.N.C. July 1, 2015) (unpublished) (holding that LPA does not qualify as acceptable medical source under regulations), recommendation adopted, No. 5:14-CV-411-D, 2015 WL 4560693 (E.D.N.C. July 28, 2015) (unpublished); Riggs v. Colvin, No. 4:13CV-00068-JHM, 2014 WL 527686, at *3 (W.D. Ky. Feb. 7, 2014) ("Under the regulations Ms. Ferguson, a licensed psychological associate, is not qualified to diagnose [the p]laintiff with depression because she is not classified as an "acceptable medical source."); Melvin v. Astrue, No. 7:11-CV-131-FL, 2012 WL 4447617, at *5 (E.D.N.C. July 3, 2012) (unpublished) (finding no error in ALJ's determination that, under the regulations, an LPA does not qualify as an acceptable medical source), recommendation adopted, No. 7:11-CV-131-FL, 2012 WL 4447607 (E.D.N.C. Sept. 25, 2012) (unpublished).

Moreover, the plain language of the regulations supports the ALJ's determination that an LPA does not constitute an "acceptable medical source." The regulation in effect at the time of the ALJ's decision defined "acceptable medical sources" to include

"[l]icensed or certified psychologists," which in turn "[i]nclude[]
. . . school psychologists, or <u>other licensed or certified
individuals with other titles</u> who perform the same function as a
school psychologist in a school setting, for purposes of
establishing intellectual disability, learning disabilities, and
borderline intellectual functioning <u>only</u>." 20 C.F.R.
§ 404.1513(a)(2) (emphasis added). By specifying that "licensed or
certified individuals with other titles" performing "<u>only</u>" the
listed school-related functions qualify as "[l]icensed or certified
psychologists" (and thus "acceptable medical sources"), the
regulations signaled the Commissioner's intent that other types of
psychological practitioners (such as "licensed psychological
associates") do <u>not</u> qualify as "licensed or certified
psychologists" (and, by extension) do <u>not</u> qualify as "acceptable
medical sources."[8]

Simply put, no sound basis exists to conclude that the ALJ
erred by classifying Ms. Glogau as a non-acceptable medical source.

---

[8] Effective March 27, 2017, the regulations define an "acceptable medical source"
to include "[a] licensed or certified psychologist <u>at the independent practice
level</u>." 20 C.F.R. § 404.1502(a)(1)(i) (2017) (emphasis added). In turn, the
Program Operations Manual System ("POMS") provides that "[a] psychologist whose
licensure authorizes him or her to practice independently <u>without supervision</u> is
an [acceptable medical source]." POMS § DI 22505.004(A). In North Carolina, the
Psychology Practice Act <u>requires</u> supervision of LPAs by a "licensed psychologist,
or other qualified professionals," when "engag[ing] in: <u>assessment of personality
functioning</u>; neuropsychological evaluation; psychotherapy, counseling, and other
interventions with clinical populations for the purpose of preventing or
eliminating symptomatic, maladaptive, or undesired behavior; and, the use of
intrusive, punitive, or experimental procedures, techniques, or measures." N.C.
Gen. Stat. § 90-270.5(e) (2012) (emphasis added); <u>see also</u> 21 N.C. Admin. Code
§§ 54.2006, 54.2008 (providing detailed requirements regarding supervision of
LPAs). Thus, even under the new regulation, Ms. Glogau would not qualify as an
acceptable medical source.

32

b. Vagueness of Opinions

Plaintiff next contends that the ALJ erred by finding Ms. Glogau's opinions vague, as Ms. "Glogau *did* 'indicate how [Plaintiff] was specifically limited in vocational terms.'" (Docket Entry at 21 (quoting Tr. 30).) Plaintiff focuses on Ms. Glogau's statement that, "'[d]ue to cognitive problems, [Plaintiff] is not able to perform any job that requires extended periods of concentration'" (id. (quoting Tr. 356)), arguing that the statement "addresses a specific functional factor – ability to maintain extended concentration – that ALJs must consider in the 'more detailed [functional] assessment' required under [Social Security Ruling] 96-8p" (id. at 22).

Plaintiff's argument fails, because it focuses exclusively on Ms. Glogau's opinion regarding Plaintiff's ability to perform jobs requiring extended periods of concentration to the exclusion of all of Ms. Glogau's other opinions. As the Commissioner noted:

> Ms. Glogau stated that Plaintiff's "memory and concentration negatively impact his ability to learn new skills." But Ms. Glogau did not indicate to what extent they "negatively impact[ed]" him and whether they prevented the performance of unskilled work. Ms. Glogau stated that Plaintiff's cognitive problems prevented "extended periods of concentration, problem solving, or decision making." But Ms. Glogau did not indicate how long Plaintiff could retain these abilities, nor did she indicate whether unskilled work would be impacted. Ms. Glogau also indicated an inability to sustain work relationships. But Ms. Glogau did not specify Plaintiff's limitations in interacting with the public, supervisors, or coworkers.

(Docket Entry 13 at 13-14 (internal citations omitted) (citing Tr. 356).)  Thus, the ALJ did not err by assigning little weight to Ms. Glogau's opinions, <u>in part</u>, as vague.  (<u>See</u> Tr. 30.)

c. Status as Examining Source

Next, Plaintiff contends that the ALJ's decision to discount Ms. Glogau's opinions because she only evaluated Plaintiff once qualifies as "self-contradictory[,]" because the ALJ "gave great weight to the opinions of the State *non*-examiners . . . while giving little weight to a DDS-appointed *examiner*."  (Docket Entry 11 at 22 (internal quotation marks omitted).)  Plaintiff's argument glosses over the fact that state agency consultants are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation," 20 C.F.R. § 404.1527(e)(2), as well as that the length of a medical source's treatment relationship with a claimant constitutes one of the factors an ALJ must consider in assigning weight to that source's opinions, <u>see</u> 20 C.F.R. § 404.1527(c).

Moreover, Social Security Ruling 96-6p, <u>Policy Interpretation Ruling Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence</u>, 1996 WL 374180 (Jul. 2, 1996) ("SSR 96-6p"), recognizes that ALJ reliance on state agency opinions depends on

their consistency with evidence subsequently received by the ALJ and Appeals Council. <u>See</u> SSR 96-6p, 1996 WL 374180, at *2 (permitting opinions of state agency psychological consultants to receive weight "only insofar as they are supported by evidence in the case record, . . . <u>including any evidence received at the [ALJ] and Appeals Council levels that was not before the [s]tate agency</u>") (emphasis added). Here, the state agency psychological consultants issued their opinions on May 13, 2013, and February 26, 2014, respectively, which <u>post-dated</u> the relevant period in this case from March 23, 2010, to June 30, 2012. Thus, the consultants lacked only Plaintiff's testimony at the hearing and evidence significantly post-dating the relevant period at the time they issued their opinions. Under such circumstances, the ALJ did not err merely by assigning more weight to the state agency psychological consultants' opinions than to those of Ms. Glogau.

d. Opinions Based on Plaintiff's Subjective Reports

Plaintiff additionally maintains that "the record does not support the ALJ's conclusion that [Ms.] Glogau's opinion was based heavily on [Plaintiff's] subjective report." (Docket Entry 11 at 22 (internal quotation marks omitted).) According to Plaintiff, Ms. Glogau "relied on her objective observations – reflected in the [mental status examination ('MSE')] – that [Plaintiff's] mood was dysthymic, that he became tearful during the interview, and that he

had blunted affect and limited range of emotion." (Id. at 23 (citing Tr. 355).)

The ALJ did not err in according little weight to Ms. Glogau's opinions, in part, because Ms. Glogau based those opinions heavily on Plaintiff's subjective reports. (See Tr. 30.) A significant portion of Ms. Glogau's report devotes itself to reciting Plaintiff's subjective reports. (See Tr. 354-55.) Moreover, as the Commissioner argues (see Docket Entry 13 at 13, 14), Ms. Glogau's perfunctory MSE did not document the severe limitations Ms. Glogau assigned to Plaintiff (compare Tr. 355, with Tr. 355-56).

In sum, Plaintiff has not demonstrated error with respect to the ALJ's evaluation of Ms. Glogau's opinions.

### 5. CPP

In Plaintiff's fifth assignment of error, he contends that, "[g]iven [Plaintiff's] moderate limitation in CPP, the ALJ was not permitted to tell the VE merely that [Plaintiff] was restricted to work with simple, routine tasks but was required to pose a hypothetical that addressed [Plaintiff's] limitation in staying on task." (Docket Entry 11 at 24.) More specifically, Plaintiff maintains that the Fourth Circuit in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), held that "'the ability to perform simple tasks differs from the ability to stay on task . . . [and] [o]nly the latter limitation would account for a claimant's limitation in

36

[CPP].'" (Docket Entry 11 at 24 (quoting <u>Mascio</u>, 780 F.3d at 638)). Plaintiff's contention does not warrant relief.

The Fourth Circuit has indeed held that "the ability to perform simple tasks differs from the ability to stay on task" and that "[o]nly the latter limitation would account for a claimant's limitation in [CPP]." <u>Mascio</u>, 780 F.3d at 638. However, that court also allowed for the possibility that an ALJ could adequately explain why moderate limitation in CPP would not result in any limitation in the RFC. <u>Id.</u> A neighboring district court had occasion to discuss this very point:

> <u>Mascio</u> does not broadly dictate that a claimant's moderate impairment in [CPP] <u>always</u> translates into a limitation in the RFC. Rather, <u>Mascio</u> underscores the ALJ's duty to adequately review the evidence and explain the decision . . . . An ALJ may account for a claimant's limitation with [CPP] by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

<u>Jones v. Colvin</u>, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015) (magistrate judge's recommendation adopted by district judge) (unpublished) (emphasis added); <u>see also</u> <u>Hutton v. Colvin</u>, No. 2:14-CV-63, 2015 WL 3757204, at *3 (N.D.W. Va. June 16, 2015) (unpublished) (finding reliance on <u>Mascio</u> "misplaced," because ALJ "gave abundant explanation" for why unskilled work adequately accounted for claimant's moderate limitation in CPP, by highlighting the claimant's daily activities and treating

physicians' opinions).  Here, the ALJ's decision provides a sufficient explanation as to why restrictions to simple, routine tasks (see Tr. 26) sufficiently accounted for Plaintiff's moderate deficit in CPP.

First, the ALJ noted that she gave Plaintiff "the benefit of the doubt" in finding that he suffered moderate limitation in CPP at step three (Tr. 26) and again during her discussion of the RFC (see 29 ("Permitting [Plaintiff] to perform simple, routine tasks gives [Plaintiff] the benefit of the doubt regarding any distraction or lack of concentration caused by his depression, anxiety, and general pain.")).  The ALJ thus signaled that she found that Plaintiff's CPP deficit fell, at most, toward the mild end of the moderate designation.  See Burger v. Colvin, No. 7:14CV00190, 2015 WL 5347065, at *14 (W.D. Va. Sept. 14, 2015) (unpublished) (concluding ALJ explained why limitation to tasks involving short, simple instructions sufficiently accounted for the claimant's moderate limitation in CPP where "ALJ appeared to just give [the claimant] the benefit of the doubt regarding [the moderate] limitation" in CPP).

Second, the ALJ discussed Plaintiff's testimony regarding his mental symptoms, including his statements "that he would lose his train of thought and forget things he started" and "that his attention span was poor," but found his statements "not entirely consistent with the medical evidence and other evidence in the

record for the reasons explained in th[e] decision." (Tr. 27.)
Notably, Plaintiff did not challenge the ALJ's assessment of
Plaintiff's subjective symptom reporting. (See Docket Entry 11.)

Third, the ALJ discussed and weighed the opinion evidence as
it related to Plaintiff's ability to function mentally. (See Tr.
27-28.) In that regard, the ALJ gave "great weight" to the
opinions of the state agency psychological consultants (Tr. 30),
who each found that, notwithstanding moderate limitation in CPP
(see Tr. 90, 124), Plaintiff could "maintain attention and
concentration for short simple instructions" (Tr. 94, 130 (emphasis
added)), and remained capable of performing "unskilled work" (Tr.
90) and simple, routine, repetitive tasks (see Tr. 131).

Under these circumstances, the ALJ adequately explained why
restrictions to simple, routine tasks (see Tr. 26) sufficiently
accounted for Plaintiff's moderate limitation in CPP. See Sizemore
v. Berryhill, 878 F.3d 72, 81 (4th Cir. 2017) (rejecting the
plaintiff's argument under Mascio where ALJ relied on opinions of
consultative examiner and state agency psychologist that,
notwithstanding moderate deficit in CPP, the plaintiff could
sustain attention sufficiently to perform SRRTs).

### 6. Plaintiff's Need for a Cane

In Plaintiff's sixth and final assignment of error, he asserts
that "[t]he ALJ's hypotheticals failed to account for [Plaintiff's]
need for a cane." (Docket Entry 11 at 25 (italics and single-

spacing omitted).)   More specifically, Plaintiff argues that, "[g]iven that [he] was prescribed a cane, and the frequency with which he needed to use it, the ALJ committed error by failing to incorporate this limitation into the RFC and hypothetical question." (Id. at 26.)  Further, Plaintiff contends that, "[i]f the ALJ thought [Plaintiff] did not need a cane *all* the time, then she should have factored into the RFC and hypothetical the extent to which he *did* need one" or "developed the record further." (Id.) Plaintiff's contentions fail as a matter of law.

"To find that a hand-held assistive device is medically required, there must be <u>medical documentation establishing the need for a hand-held assistive device</u> to aid in walking or standing, and <u>describing the circumstances for which it is needed</u> (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  Security Ruling 96-9p, <u>Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work</u>, 1996 WL 374185, at *7 (July 2, 1996) ("SSR 96-9P") (emphasis added). Moreover, "the legal issue does not turn on whether a cane was 'prescribed' . . . but whether a cane was 'medically required.'" <u>Spaulding v. Astrue</u>, 379 F. App'x 776, 780 (10th Cir. 2010).

Here, although Plaintiff testified that the Veterans Administration ("VA") <u>prescribed</u> a cane for him a few years before

the hearing (see Tr. 48), the record shows only that the physical therapy department of the VA issued a cane to Plaintiff on January 13, 2011 (see Tr. 452-55) and, after he lost the first one, on October 3, 2011 (see Tr. 483-86). Even "assuming the [VA's] provision of the cane as a prosthetic appliance constitutes a 'prescription,'" Spaulding, 379 F. App'x at 780, the VA records here lack any statement by a treating physician as to the medical necessity of the cane or the circumstances for which Plaintiff needed it (see Tr. 452-55, 483-86). "Failing that, [the] ALJ [wa]s not required to include the use of [an assistive device] in [Plaintiff's] RFC." Fletcher v. Colvin, No. 1:14CV380, 2015 WL 450 6699, at *8 (M.D.N.C. July 23, 2015) (unpublished) (Webster, M.J.), recommendation adopted, slip op. (M.D.N.C. Aug. 14, 2015) (Biggs, J.).

### III.  CONCLUSION

Plaintiff has not established an error warranting reversal or remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 10) be denied, that

Defendant's Motion for Judgment on the Pleadings (Docket Entry 12)

be granted, and that this action be dismissed with prejudice.

                          /s/ L. Patrick Auld
                     **L. Patrick Auld**
              **United States Magistrate Judge**


August 28, 2018